IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**DONALD BRIDGEFORTH, et al.**                         **PLAINTIFFS**

**v.**                 **Case No. 4:20-CV-917-LPR**

**NEW AGE DISTRIBUTING, INC.**                     **DEFENDANT**

## ORDER

This case, filed on August 10, 2020, involves allegations of unpaid overtime compensation.[1]  Shawn Heard, Jr., Jeremy Jamerson, Laquinton Piggee, and Christopher Williams are the only remaining Plaintiffs.[2]  They allege that Defendant New Age Distributing, Inc. has failed to pay them proper overtime compensation in violation of the Fair Labor Standards Act and the Arkansas Minimum Wage Act.[3]  Pending before the Court is New Age's Motion for Summary Judgment.[4]  For the following reasons, the Court GRANTS in part and DENIES in part that Motion.

## BACKGROUND[5]

New Age "is a company that delivers soft drinks by trucks to customers, which range from

---

[1] Compl. (Doc. 1).

[2] Former Plaintiffs William Mason Courtney and Tommie Keener were dismissed with prejudice on January 28, 2022. Stipulation of Dismissal (Doc. 12).  Former Plaintiffs Javii Goins, Aredious Kelly, and Corey Hogue were dismissed with prejudice on May 18, 2022.  Order (Doc. 28).  On July 12, 2022, the Court granted New Age summary judgment on former Plaintiff Donald Bridgeforth's claims because they were time barred.  Order (Doc. 35).

[3] Compl. (Doc. 1) ¶¶ 54–71.

[4] Def.'s Mot. for Summ. J. (Doc. 17).

[5] For this Background Section, the Court relies largely on undisputed facts.  Where there is a genuinely disputed fact, the Court adopts the version of the fact that is most favorable to Plaintiffs, unless no rational juror would adopt that version of the fact.  And the Court gives Plaintiffs all reasonable inferences from all the facts.  Essentially, the Court considers the most pro-Plaintiffs version of the record that a rational juror could conclude occurred.  *See Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 760 (8th Cir. 1998).

liquor stores to large grocery [stores]."[6]  Mr. Heard, Mr. Jamerson, Mr. Piggee, and Mr. Williams all worked for New Age as Merchandisers.[7]  One primary responsibility of a Merchandiser is to unload product that has been delivered to a store by a driver and then "take the product from the point of delivery and put it into the coolers and on the shelves in the . . . storefront where the customers buy it . . . ."[8]  Another primary responsibility of a Merchandiser is to visit customer stores each day (or at least often) and restock the coolers and shelves with New Age products from the back of the store.[9]

Each Merchandiser works "a set route" that services specific "stores in different geographic locations."[10]  The work required by each route varies from day to day.  One reason for the day-to-day variation is that each store on a Merchandiser's route has "load days" and "non-load days."[11]

---

[6] Pls.' Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶ 2.

[7] Compl. (Doc. 1) ¶¶ 18, 22, 28, 30; Answer (Doc. 8) ¶¶ 18, 22, 28, 30.  Mr. Williams also worked for New Age as a Merchandiser Salesman.  Williams Dep. (Doc. 37) at 9:5–8.  When he worked as a Merchandiser Salesman, Mr. Williams's job duties included those of a Merchandiser, *see infra* notes 8–9 and accompanying text, in addition to taking stores' orders for product to be delivered in the future.  Williams Dep. (Doc. 37) at 9:23–10:16.  He would perform the Merchandiser and Merchandiser Salesman duties "at the same time" when servicing stores.  *Id.* at 9:17–22.

[8] Piggee Dep. (Doc. 36) at 7:14–20; *see* Jamerson Dep. (Doc. 39) at 9:13–18; Heard Dep. (Doc. 38) at 9:19–24; *see also* Pls.' Resp. to Def.'s Statement of Material Facts (Doc. 23) ¶ 17.

[9] *See* Williams Dep. (Doc. 37) at 10:4–11 ("[Mr. Vandiver:] [W]hen you say stock the store up, do you mean take the merchandise, New Age drinks that are delivered to the store, and you put them in the coolers and the cabinets that are inside the store?  [Mr. Williams:] Yes, sir.  And then some – like big stores, Walmart and all them, the merchandise, some stuff be already in the back room."); Heard Dep. (Doc. 38) at 17:15–21 ("So on Tuesday, your first four stores would be back stock stores to go – you know, Walmart always sold, so you had just a product to go put out.  And then you go to your stores to get your loads."); Jamerson Dep. (Doc. 39) at 14:4 ("[O]n Sundays, trucks don't come."); *id.* at 21:12–17 ("Sundays w[ere] different because you didn't have any loads. . . . So when you go to the store [on] Sunday, you don't have to wait on any trucks, everything will be there.").

[10] Ex. A (Frantz Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-1) ¶¶ 8, 11; Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2) ¶¶ 9, 12; Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3) ¶¶ 7, 10; Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4) ¶¶ 8, 11; *see* Jamerson Dep. (Doc. 39) at 11:6–10; Heard Dep. (Doc. 38) at 9:25–10:10; Williams Dep. (Doc. 37) at 10:17–19; Piggee Dep. (Doc. 36) at 8:18–19.

[11] *See* Ex. A (Frantz Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-1) ¶¶ 9–10; Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2) ¶¶ 10–11; Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3) ¶¶ 8–9; Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4) ¶¶ 9–10.

And each particular store's "load days" and "non-load days" "can differ over time."[12]  A store's "load days" involve the Merchandiser receiving New Age product at the store and thus generally require longer hours and more work than "non-load days."[13]  On some "load days," "there is no product in the front of the store . . . , so the Merchandiser has to completely replace the empty section with new product."[14]  On other "load days," stores need to stock up for the weekend, so the Merchandiser has to work with a delivery of a higher volume of product.[15]  "Non-load days," on the other hand, only require "the Merchandiser . . . to replace product that was bought the day prior."[16]  And this usually involves fairly small quantities of product that are already in the back of the store.[17]

There are other variables that affect the length of a Merchandiser's workday.  Some variables apply to only "load days" and others apply to all days.  For example, a Merchandiser's daily workload may be impacted by the arrival of the truck carrying the product for the Merchandiser to unload.  If the Merchandiser arrives at the store before the truck, the Merchandiser is stuck waiting.[18]  And at most stores, Merchandisers can't pull pallets of product onto the store

---

[12] Ex. A (Frantz Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-1) ¶ 11; Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2) ¶ 12; Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3) ¶ 10; Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4) ¶ 11.

[13] Ex. A (Frantz Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-1) ¶¶ 9–10; Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2) ¶¶ 10–11; Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3) ¶ 8–9; Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4) ¶¶ 9–10; Pls.' Resp. to Def.'s Statement of Material Facts (Doc. 23) ¶ 19 ("Plaintiffs admit that load days require longer hours . . . .").

[14] Ex. A (Frantz Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-1) ¶ 9; Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2) ¶ 10; Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3) ¶ 8; Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4) ¶ 9.

[15] *See* Heard Dep. (Doc. 38) at 13:1–5, 16:1–3; *see also* Piggee Dep. (Doc. 36) at 14:24–15:3.

[16] Ex. A (Frantz Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-1) ¶ 10; Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2) ¶ 11; Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3) ¶ 9; Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4) ¶ 10.

[17] *See* Jamerson Dep. (Doc. 39) at 14:4, 21:12–17; Heard Dep. (Doc. 38) at 11:25–12:3.

[18] *See* Jamerson Dep. (Doc. 39) at 12:14–17 ("[Y]ou can't never pinpoint a time on a store because you don't know if the truck's going to be late . . . ."); *see also* Piggee Dep. (Doc. 36) at 12:12–13 ("Oh, [time spent at a store] can be anywhere from an hour and a half to two, depending on when the truck arrive[s]."); Heard Dep. (Doc. 38) at 16:7–13

floor after a certain time.[19]  If the Merchandiser is working at a time when pallets are not allowed, they have to use "ground carts," which move less product at once, requiring more trips.[20] Additionally, if a store is running a sale or an advertisement campaign, or needs a New Age product display built on a particular day, a Merchandiser will have to spend more time at that store that day.[21]  On top of all of this is the fact that each store a Merchandiser services has a fluctuating amount of work depending on the seasonal demand for the product for which the Merchandiser is responsible.[22]  In short, the amount of work necessary on a given day is hard for a Merchandiser to predict (or remember).

Although a Merchandiser's daily workload fluctuates, New Age strives "to keep the length of each route consistent . . . ."[23]  According to New Age, it even "changes the stores on each route to assure that no Merchandiser is working significantly more or less than any other Merchandiser on a different route."[24]  And New Age appears to believe that a "Merchandiser would never work

---

("I mean, every day was different. . . .  You may – and, I mean, [the truck driver] may be blown out, you be there longer, you might be waiting on a truck.  So, I mean, there's a lot of variables as to how long you work in the stores.").

[19] Heard Dep. (Doc. 38) at 14:1–5; Jamerson Dep. (Doc. 39) at 12:18–21.

[20] Heard Dep. (Doc. 38) at 14:1–5 ("[A]fter 9:00 o'clock, you have to cart everything out.  You can't use pallets.  It takes longer.  You have to put it on a ground cart and cart it out.  [The ground cart] only holds like 10 cases."); see Jamerson Dep. (Doc. 39) at 12:18–21 ("So you can't pull pallets on the floor after 7:00 a.m.").

[21] Heard Dep. (Doc. 38) at 16:22–17:1 ("[I]f [I] have displays to build – [I] might have a sale and now [I] have to fill a display, I might have a display in the store, so it's going to take another 20 minutes to fill the display."); Williams Dep. (Doc. 37) at 18:14–16 ("[W]hen we have ads in stores, some of them days lingered to 12 hours a day[,] sometime that whole week, like, we have a sale."); id. at 19:4–5 ("Like when we had them sales, we work even longer.").

[22] Ex. A (Frantz Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-1) ¶ 11; Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2) ¶ 12; Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3) ¶ 10; Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4) ¶ 11.

[23] Ex. A (Frantz Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-1) ¶ 11; Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2) ¶ 12; Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3) ¶ 10; Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4) ¶ 11.

[24] Ex. A (Frantz Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-1) ¶ 13; Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2) ¶ 14; Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3) ¶ 12; Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4) ¶ 13.  The record does not clearly state how New Age ensures consistency of work time.  In any event, nothing in the record suggests that New Age ever actually changed the composition of Plaintiffs' specific routes.

more than forty (40) hours per week no matter the route or time of year."[25]

New Age's professed belief in consistent route length and forty-hour workweeks are consistent with how it pays Merchandisers. No matter the number of actual hours worked, New Age pays Merchandisers for forty hours of work per week. In other words, Merchandisers are paid their "full salary" even when they work less than eight hours in a day or less than forty hours in a week.[26] Of course, that also means Merchandisers are paid for forty hours of work per week even if they work more than forty hours.

Each Plaintiff has a different story to tell about their tenure with New Age. And the variability in testimonies may matter for the summary judgment analysis. So, the Court will discuss each Plaintiff individually.

## I.    Mr. Heard

Mr. Heard started work as a Merchandiser for New Age on approximately January 5, 2018.[27] For the first two months of his employment, Mr. Heard serviced the Searcy Route, which covered Searcy, Cabot, and Jacksonville.[28] For the next two months, he covered the Saline County

---

[25] Ex. A (Frantz Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-1) ¶ 13; Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2) ¶ 14; Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3) ¶ 12; Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4) ¶ 13.

[26] Pls.' Resp. to Def.'s Statement of Material Facts (Doc. 23) ¶ 23 (admitting that "Merchandisers are paid their full salary even when they work less than eight hours in a single day" with the caveat that "Plaintiffs rarely, if ever, worked less than eight hours in a single day"); Piggee Dep. (Doc. 36) at 7:21–8:1; *see also* Ex. G (McGee Dep.) to Def.'s Mot. for Summ. J. (Doc. 17-7) at 25:13–15. *But see* Jamerson Dep. (Doc. 39) at 10:20–11:4 ("[Mr. Vandiver:] But hypothetically, if you did work less than 40 hours a week, you would still get paid for the 40 hours; right? . . . [Mr. Jamerson:] No. Because if you – if you work less than 40 hours, let's say you miss a day, you're not on a salary basis, they're just paying you – I wasn't on salary; so if I worked under 40 hours and called in and missed a day, no, I don't get paid for the full 40 hours."). This evidentiary dispute is not material to the outcome of the case. Whether New Age pays its Merchandisers for forty hours per week when they work less than forty hours per week—which is likely given the weight of the evidence—does not affect whether New Age needs to pay overtime, at least not given the facts of and arguments presented in this case. There is no argument that some sort of "salary" exception applies to Plaintiffs that would remove them from the ambit of the FLSA/AMWA overtime rules.

[27] Heard Dep. (Doc. 38) at 9:2–4.

[28] *Id.* at 10:4–10, 26:23–27:7.

Route, which serviced south Little Rock.[29]   And after about two months on the Saline County

Route, Mr. Heard was moved to the West Little Rock Route.[30]   No matter his route assignment,

Mr. Heard worked five days a week; he did not work on Wednesdays or Sundays.[31]

The only (specific) record evidence of Mr. Heard's tenure with New Age comes by way of

Mr. Heard's deposition testimony.   That testimony—including general estimates of hours

worked—is based solely on Mr. Heard's memory.[32]   And although Mr. Heard provides fairly

significant details about the hours he generally worked on two of his three routes, he concedes that

a route would "never be the same every day."[33]   It is thus not surprising that Mr. Heard cannot

point to a particular day or week on the calendar and specify how many hours he worked that

particular day or week.[34]   To make matters worse, neither Mr. Heard nor New Age provided any

records, notes, or journals regarding Mr. Heard's hours worked.[35]   And Mr. Heard's estimates do

not appear to account for holidays, vacations, sick days, or personal breaks.[36]   With this

understanding of the sparse record before it, the Court will now recount Mr. Heard's route-by-

route testimony.

---

[29] *Id.* at 27:8–11.

[30] *Id.* at 27:16–28:1.

[31] *Id.* at 10:17–18, 28:16–20.

[32] *Id.* at 35:2–8.

[33] *Id.* at 16:11–13, 17:5.

[34] *Id.* at 37:9–18.

[35] *Id.* at 34:12–16.  Mr. Heard does state that he would "sign in and out" using a "logbook" in each store he serviced. *Id.* at 34:16–21.  But those logbooks are not in the record.  At the hearing on the instant Motion, New Age's counsel stated that New Age requested those records from the stores, but none of the stores had retained the records for the time period relevant to this case.  *See* July 11, 2022 Hr'g Tr. (Rough) at 21.  There is no suggestion of a spoliation-of-evidence problem.

[36] On the other hand, Mr. Heard did account for lunch breaks (or the absence thereof), stating that he would eat while driving from one store to the next.  Heard Dep. (Doc. 38) at 18:21–19:8 ("[Mr. Vandiver:] Would you take lunches? [Mr. Heard:] You're supposed to take a lunch; but, honestly, I didn't.  And we didn't clock in or out, so.  [Mr. Vandiver:] You never ate lunch?  [Mr. Heard:] I mean, like I say, I'm driving from Searcy to Jacksonville.  I mean, you can grab something on the way.").

## A.      Mr. Heard's Searcy Route

Mr. Heard testified that he worked between fifty and fifty-two hours per week on the Searcy Route.[37]  He breaks down his estimate by days of the week.  For ease of comprehension, the Court will recount his full day estimates in "above-the-line" text and his support for that estimate in an affiliated footnote.[38]

Mr. Heard estimates that on Mondays he worked from 5:00 a.m. to between 2:00 p.m. and 3:00 p.m.[39]  On Tuesdays, he worked from about 5:00 a.m. to 2:00 p.m.[40]  Mr. Heard was off on Wednesdays.[41]  He worked on Thursdays from 5:00 a.m. to 3:00 p.m. or 4:00 p.m.[42]  On Fridays, Mr. Heard started work at 5:00 a.m. and ended by 4:00 p.m.[43]  On Saturdays, Mr. Heard began his route at about 4:00 a.m. and ended around 1:30 p.m. or 2:00 p.m.[44]  Mr. Heard was off on

---

[37] *Id.* at 26:13–16.

[38] The Court will do the same for the other Plaintiffs as well.

[39] *Id.* at 10:11–11:16, 15:16–22.  His Monday route started at the Searcy Walmart (where he spent about two hours), continued with Cabot Walmart (for about one hour or one-and-one-half hours), Searcy Kroger (for about one hour), Bill's Country Mart (for about thirty minutes or one hour, depending on if there was a load that day or not), Beebe Food Giant (for about one hour), Jacksonville Kroger (for one hour or one-and-one-half hours), and ended at the Jacksonville Food Giant (where he spent about one hour).  *Id.* at 10:19–15:1.

[40] *Id.* at 19:12–16, 22:16–23:2.  His Tuesday route consisted of Searcy Walmart (for about one hour), Searcy Harps (for about one hour), Searcy Neighborhood Walmart (for about one hour), Beebe Food Giant (for about one hour), Cabot Harps (for about one hour), Cabot Kroger (for about one-and-one-half hours), Cabot Walmart (for about one hour), and Jacksonville Kroger (for about one hour).  *Id.* at 19:12–21:25.  On some Tuesdays, Mr. Heard also went to Jacksonville Food Giant for about one hour to "put some items out," but this did not happen often.  *Id.* at 21:25–22:14.

[41] *Id.* at 28:16–18.

[42] *Id.* at 17:22–18:20.  Mr. Heard's Thursday route was the same as his Monday route, except for the fact that he worked longer at each store on Thursday because the stores needed to be stocked for the weekend.  *Id.* at 10:11–15, 15:5–16:3, 18:10–16.  Mr. Heard always left on Thursdays by 4:00 p.m. because he had a second job that he had to show up to by 5:00 p.m.  *Id.* at 18:17–20.

[43] *Id.* at 23:3–5, 23:18–20.  His Friday route was the same as his Tuesday route.  *Id.* at 10:11–14.  It is not clear if this ever included going back to Jacksonville Food Giant to "put some items out," as he occasionally did on Tuesdays.  *Id.* at 21:25–22:10.  Like Thursdays, Mr. Heard always ended work on Fridays by 4:00 p.m. so that he could make it to his second job by 5:00 p.m.  *Id.* at 23:3–5.

[44] *Id.* at 25:17–25.  Mr. Heard testified that, on Saturdays, he did "back stock" at "all [his] stores."  *Id.* at 10:15, 11:23–12:3; *see* 25:4–26:3.  He did so because the stores needed to be stocked for the rest of Saturday and Sunday (and the stores weren't serviced on Sundays).  *See id.* at 25:4–11.  As the Court understands it, "back stock" is filling a store's cooler shelves with product that is already in the store's back room from a previous load as opposed to unloading a fresh product shipment at the store.  *See id.* at 11:23–12:3, 26:3–9.

Sundays.[45]  These estimates add up to between forty-eight-and-a-half and fifty-one hours per week.

###### B.    Mr. Heard's Saline County Route

After working the Searcy Route for about two months, Mr. Heard was switched to the Saline County Route.[46]  Mr. Heard did not provide much detail about his Saline County Route. When asked about his average weekly hours, he responded that they were "about the same" as the Searcy Route.[47]  Mr. Heard further noted that the Saline County Route was "less driving, but the [Saline County Route] stores had more volume" compared to the Searcy Route stores.[48]  Mr. Heard worked the Saline County Route for about two months before he was switched to the West Little Rock Route.[49]  That is the entirety of the record evidence with respect to Mr. Heard's time on the Saline County Route.

###### C.    Mr. Heard's West Little Rock Route

Mr. Heard estimates that he worked about fifty-five hours per week on the West Little Rock Route.[50]  He started his Mondays at 5:00 a.m. and ended between 2:00 p.m. and 3:00 p.m.[51]  Mr.

---

[45] *Id.* at 28:16–18.

[46] *Id.* at 26:23–27:11.

[47] *Id.* at 27:8–15.  He testified that he worked between fifty and fifty-two hours per week on the Searcy route.  *See supra* note 37 and accompanying text.

[48] Heard Dep. (Doc. 38) at 27:12–15.

[49] *Id.* at 27:16–20.

[50] *Id.* at 28:2–5.  Mr. Heard says the West Little Rock Route took more time per week because the stores on the West Little Rock Route were all "Super Center stores" that "command[ed] a little more time."  *Id.* at 28:5–15.

[51] *Id.* at 30:20–25.  Mr. Heard's Mondays on the West Little Rock Route consisted of Polk Street Kroger (for about one hour), Chenal Kroger (for two or three hours), Highway 10 Walmart (for about one hour), Highway 10 Kroger (for between two and two-and-one-half hours), Markham Kroger (for about one-and-one-half hours), and Cantrell Food Giant (for about one hour).  *Id.* at 28:21–30:19.  Mr. Heard's West Little Rock Route on Mondays was sometimes thrown off track by the truck drivers.  Specifically, he often had to wait for a truck to arrive to the store.  *Id.* at 31:20–32:5.  If Mr. Heard waited longer than thirty minutes for the truck to arrive, he "wouldn't run [the route] how it's supposed to be r[u]n . . . ."  *Id.* at 32:2–14.  Essentially, instead of waiting for the truck, Mr. Heard would "do the back stock or" go to "another back stock store" before returning to receive the load from the truck.  *Id.*

Heard worked from about 5:00 a.m. to 3:00 p.m. on Tuesdays.[52]   Mr. Heard was off on Wednesdays.[53]  Mr. Heard has not testified to what time he started work on Thursdays and Fridays on the West Little Rock Route, specifically.  But he did suggest in another portion of his deposition that (except for Saturdays) he started at 5:00 a.m. regardless of the route or day.[54]  He ended work on Thursdays around 3:00 p.m.[55]  And on Fridays, he ended work at 4:00 p.m.[56]  On Saturdays, Mr. Heard started working at midnight and finished between 11:00 a.m. and noon.[57]  He started so much earlier on Saturdays because he needed to service all twelve West Little Rock stores, many of which closed early in the day, and it was easier to service them at night when there were fewer customers and merchandisers from other distributors in the stores.[58]  Mr. Heard did not work on Sundays.[59]  These estimates add up to between fifty-one and fifty-three hours per week.

### D.    Mr. Heard Quits

Mr. Heard quit on October 13, 2018.[60]  He testified that he quit "because [he] wasn't getting compensated."[61]  More specifically, Mr. Heard said he was "working 50 to 60, 55 hours a week

---

[52] *Id.* at 32:22–33:4.  On Tuesdays, Mr. Heard "did back stock" at his first three or four stores.  *Id.* at 32:15–18.  He then serviced Bowman Kroger, Shackleford Kroger, and "two more loads somewhere . . . ."  *Id.* at 32:18–21.  Mr. Heard did not specify how long he spent at each store on Tuesdays, or what stores the final "two more loads" were at.

[53] *Id.* at 28:16–18.

[54] *See id.* at 30:20–22 ("[Mr. Vandiver:] And would you still start around 5:00 a.m. on Mondays?  [Mr. Heard:] 5:00 o'clock every day.").

[55] *Id.* at 33:2–6.

[56] *Id.* at 33:8–10.  Like he did Thursdays and Fridays on the Searcy Route, when Mr. Heard worked the West Little Rock Route, he stopped working on Fridays at 4:00 p.m. so that he could make it to his second job by 5:00 p.m. *See supra* notes 42–43; Heard Dep. (Doc. 38) at 33:8–12.

[57] Heard Dep. (Doc. 38) at 33:15–34:4.

[58] *Id.*

[59] *Id.* at 28:16–18.

[60] *Id.* at 9:7–9, 36:14–15.

[61] *Id.* at 36:5–6.

for 600 bucks . . . ."[62]   And that was not enough for him.

It is not entirely clear from the record whether Mr. Heard ever complained to anyone at New Age about his pay before quitting.   When first asked at his deposition, Mr. Heard denied complaining to anyone at New Age about his pay.[63]   But then Mr. Heard said that he "[t]alked to [his] supervisor [Barry Gallot] about it."[64]   Mr. Gallot told Mr. Heard, "[Y]ou're getting paid for the daily pay, you're not getting paid by the hours."[65]   That is the extent of the record evidence regarding Mr. Heard complaining to New Age about his pay.   No one deposed Mr. Gallot and Mr. Gallot has not provided a declaration in support of either party in this case.

## II.   Mr. Jamerson

Mr. Jamerson started work as a Merchandiser for New Age on June 9, 2017.[66]   When he was first hired, Mr. Jamerson questioned his pay.   He asked "two ladies" that worked for New Age "how [New Age could] pay a person 40 hours, no overtime, trying to guarantee that that's all [they're] going to work, because [they're] not going to always work 40 hours."[67]   One (or both) of the unidentified ladies allegedly told him in response that "trucks don't come on Sunday.   So on Sunday, [he would only] work 4 hours."[68]   Mr. Jamerson seems to have been unsatisfied with that response.[69]   In fact, he says he "kept getting in a big debate about the pay," although he does not

---

[62] *Id.* at 36:5–7.

[63] *Id.* at 35:20–23.

[64] *Id.* at 35:24–36:10.   Mr. Heard makes passing references to trying to become a salesman at New Age because the Merchandiser pay was too low.   *Id.* at 35:20–23 ("[Mr. Vandiver:] Did you ever complain to anyone at New Age about your pay?   [Mr. Heard:] About my pay, no.   I was trying to become a salesman."); *id.* at 36:8–11 ("[Mr. Vandiver:] Did you ever – but you never complained about [your compensation]?   [Mr. Heard:] Talked to my supervisor about it.   That's why I tried to become a salesman.").

[65] *Id.* at 36:1–3.

[66] Jamerson Dep. (Doc. 39) at 8:5–9.

[67] *Id.* at 13:22–14:1, 15:18–16:2.   Mr. Jamerson never identified who the "two ladies" were.

[68] *See id.* at 14:3–6.

[69] *See id.* at 14:6–8.

identify with whom he would debate.[70]  Despite his reservations, Mr. Jamerson decided to keep working for New Age.  He says he did so because "you can't argue with what they're going to pay, only thing you can do is take the job and do it or don't work."[71]

At his deposition, Mr. Jamerson recounted some details about the route he drove for New Age.  That testimony goes as follows.  During his tenure, Mr. Jamerson serviced the West Little Rock Route.[72]  He worked six days a week—Mr. Jamerson always had Wednesdays off.[73]  He started each day around 6:00 a.m. at the Kroger on Polk Street.[74]  And he ended each day "at a Walmart or at [a] Food Giant[], . . . depending on . . . the day . . . ."[75]  Mr. Jamerson's days (except Sundays) ended between 3:30 p.m. and 6:00 p.m.[76]  On Sundays, he ended between 12:00 p.m. and 2:00 p.m.[77]  Mr. Jamerson's daily route "normally" included "eight to ten" stores, but he has not detailed what stores he visited on what day in what order.[78]  And he could not recall how long

---

[70] *Id.* at 14:9–24.

[71] *Id.* at 14:10–13.

[72] *Id.* at 11:6–10.

[73] *Id.* at 11:18–24, 23:3–6, 23:13–15.

[74] *Id.* at 17:15–22, 21:18–20.  At another point in his deposition, Mr. Jamerson testified that he "think[s]" his first store was "Kroger off Beach Street . . . ."  *Id.* at 11:25–12:4.

[75] *Id.* at 17:23–18:3.

[76] *Id.* at 18:8–14.  Mr. Jamerson's start and end times add up to between nine-and-one-half hours and twelve hours per day.  At another point in his deposition, he testified that his days ranged from eight to twelve hours.  *Id.* at 13:7–9 ("But some days – some days, you can work 10 hours; some days, work 8 hours; some days, you can work 12 hours, you know.").

[77] *Id.* at 21:21–22:4.  Mr. Jamerson said his Sundays were shorter because there were not any loads on Sundays.  *Id.* at 21:12–17.

[78] *Id.* at 11:11–21, 17:1–14.  In fact, at another point in his deposition, Mr. Jamerson said that his work as a Merchandiser was "not . . . the same every day . . . ."  *Id.* at 13:4–7.

he generally spent at each store.[79]  In total, he serviced twelve stores per week.[80]

All of Mr. Jamerson's testimony is based solely on his memory.[81]  Mr. Jamerson did not keep any notes, records, or journals that could substantiate his estimates.[82]  And New Age has not produced any records that could credit or discredit Mr. Jamerson's estimates.  Additionally, Mr. Jamerson's route testimony does not specifically account for vacation days, sick days, or holidays, although it does in some sense account for lunch and personal breaks.  For lunch, Mr. Jamerson says he "snacked on something in the stores where [he] was working . . . ."[83]  But he never stopped to eat lunch.[84]  Similarly, Mr. Jamerson says he never stopped for other personal breaks (such as restroom breaks).[85]

Mr. Jamerson has provided two estimates of his weekly hours worked at New Age.  His first estimate is that he worked between forty-eight and fifty hours a week.[86]  Mr. Jamerson's second estimate is that he worked between forty-five and fifty-six hours per week.[87]  Either way, he cannot say how many hours he worked in any particular day or week on the calendar.[88]

Mr. Jamerson's tenure at New Age was short-lived.  He worked there for just over two

---

[79] *Id.* at 12:12–13:3 ("You can't never – you can't never pinpoint a time on a store because you don't know if the truck's going to be late, the product's going to be there, so you really just can't tell. . . . [Y]ou can't never just pinpoint a time frame on when you'll be in a store.").

[80] The twelve stores were Kroger on Chenal, Walmart on Chenal, Kroger on Beechwood, Kroger on Polk, Edwards Food Giant on Cantrell, K-Mart on Rodney Parham, Kroger on Rodney Parham, Walmart on Shackleford, Walmart on Bowman, Target on Chenal, Target on University, and Edwards Food Giant on John Barrow.  *Id.* at 16:12–25.

[81] *Id.* at 18:19–20.

[82] *Id.* at 18:15–18; Ex. L (Jamerson Interrog. Resps.) to Def.'s Mot. for Summ. J. (Doc. 17-12) ¶ 11.

[83] Jamerson Dep. (Doc. 39) at 19:19–22.

[84] *Id.* at 19:20–23.

[85] *Id.* at 19:24–25.

[86] Ex. L (Jamerson Interrog. Resps.) to Def.'s Mot. for Summ. J. (Doc. 17-12) ¶ 6.

[87] Jamerson Dep. (Doc. 39) at 19:2–6.

[88] *Id.* at 19:7–9 ("[Mr. Vandiver:] But you can't tell – you can't tell me which week was 45 and which week was 56? [Mr. Jamerson:] No, I can't tell you that.").

months—resigning on August 15, 2017.[89]  Mr. Jamerson says that his total hours worked per week is "one of the main reasons" he resigned.[90]

## III.    Mr. Piggee

Mr. Piggee started working for New Age around June 8, 2017.[91]  Like Mr. Heard and Mr. Jamerson, Mr. Piggee testified at his deposition about his time at New Age.  His testimony includes details about his route and hours worked—it goes as follows.  Mr. Piggee serviced a route that included Conway, Greenbrier, and Vilonia.[92]  He testified that he worked over eight hours every workday and that "some days would be more hectic than others . . . ."[93]  His workweeks started on Mondays at 5:00 a.m.[94]  Mr. Piggee would take a break (of unspecified length) around 1:30 p.m. or 2:00 p.m. on Mondays, and then return to his last store of the day to work another two hours.[95]  On Tuesdays, Mr. Piggee started at 5:00 a.m. and ended between 4:00 p.m. and 4:30 p.m.[96]  Mr.

---

[89] Pls.' Resp. to Def.'s Statement of Material Facts (Doc. 23) ¶ 13.  Mr. Jamerson now admits that his last day of employment at New Age was August 15, 2017.  *Id.*  But when asked at his deposition about his last day, Mr. Jamerson had trouble remembering the date.  *See* Jamerson Dep. (Doc. 39) at 8:10–22, 25:11–24.

[90] Jamerson Dep. (Doc. 39) at 10:14–19.

[91] Piggee Dep. (Doc. 36) at 6:18–21.

[92] *Id.* at 8:20–9:1.

[93] *Id.* at 16:15–17.

[94] *Id.* at 9:7–11.  The stores Mr. Piggee serviced on Mondays were Dave Ward Walmart (for forty-five minutes to one hour), Salem Kroger (for between one-and-one-half and two hours), Skyline Drive Walmart (for between one-and-one-half and two hours), Oak Street Kroger (for one-and-one-half hours), Target (for about one hour), and 10 Box (for a total of three-and-a-half to four hours).  *See id.* at 10:13–11:22.

[95] Mr. Piggee explained in his deposition that he would initially "work all of [his] backstock" at the 10 Box (his last store on Mondays) but wouldn't be able to continue working because "the order wouldn't arrive on time . . . ."  *Id.* at 11:5–11.  So, Mr. Piggee would go home "anywhere from 1:30 [p.m.] to 2:00 [p.m.]."  *Id.* at 11:15–18.  Then, when he received a phone call that the order had arrived at 10 Box, Mr. Piggee returned to work at the store "for another two hours."  *Id.* at 11:15–22.

[96] *Id.* at 12:3–9, 15:4–7.  Mr. Piggee started Tuesdays at Dave Ward Walmart (for one-and-one-half to two hours).  *Id.* at 12:4–13.  From there, he continued at either the Skyline Walmart or Salem Kroger, depending on where the truck with the loads went.  *Id.* at 12:14–21.  Assuming his second store was Skyline Walmart, it took him between two-and-one-half to three hours.  *Id.* at 12:21–23.  Sometimes at the Skyline Walmart, Mr. Piggee had to wait forty-five minutes to one hour for the truck to arrive.  *Id.* at 13:2–5.  While waiting, Mr. Piggee would do back stock.  *Id.* at 13:8–14.  He then continued to Salem Kroger (working there for four-and-one-half hours), Oak Street Kroger (for two hours), 10 Box (for one hour and fifteen minutes), and Target (for one-and-one-half hours).  *Id.* at 13:15–14:15.

Piggee did not work on Wednesdays.[97]  His Thursday route was "basically . . . the same" as his Monday route—5:00 a.m. to 1:30 p.m. or 2:00 p.m.[98]  (It is not clear if Mr. Piggee took a break before returning to his last store of the day on Thursdays, as he did on Mondays.)  Fridays, Mr. Piggee worked from 5:00 a.m. to 5:30 p.m.[99]  On Saturdays, Mr. Piggee worked from 4:30 a.m. to 3:30 p.m.[100]  Mr. Piggee was off on Sundays.[101]  These daily estimates add up to a workweek of between fifty-three-and-a-half and fifty-five hours.

Mr. Piggee's estimates are based solely on his memory.[102]  He did not keep notes, records, or journals that could substantiate his estimates.[103]  And New Age has provided no such records. Additionally, Mr. Piggee's estimates do not specifically account for holidays, sick days, or days when he left work for personal business.  It appears he would leave for personal business for one of two reasons.  On some occasions, Mr. Piggee went home at noon to take care of his daughter.[104] He testified that he did this once or twice a month and that each time took him "10, 15 minutes, 30 minutes tops.  [But] no longer than an hour."[105]  On other occasions, Mr. Piggee stopped working before finishing his route because "after a certain [number of] hours, . . . [he] had to be at

---

[97] *Id.* at 8:15–17, 14:16–17.

[98] *Id.* at 14:18–21; *see supra* notes 94–95 and accompanying text.

[99] Piggee Dep. (Doc. 36) at 15:8–12, 15:18–21.  Mr. Piggee's Friday route was the same as his Tuesday route, although Fridays took longer because each store required more product on Fridays to prepare for the weekend.  *Id.* at 14:22–15:3.

[100] *Id.* at 17:3–11, 18:4–6.  Mr. Piggee started Saturdays in Conway where he serviced two Walmarts, two Krogers, a Target, a 10 Box, and a Neighborhood Market.  *Id.* at 16:20–25, 17:17–24.  He then went to Greenbrier and serviced a Harps and a Neighborhood Market.  *Id.* at 16:25–17:2, 17:25–18:3.

[101] *Id.* at 8:15–17.

[102] *Id.* at 19:3–6.

[103] *Id.* at 18:7–12.  Mr. Piggee mentions that he had to "sign-in" at each store.  *Id.* at 18:10–19:2.  The records that include Mr. Piggee's "sign-ins" are kept by the third-party stores that Mr. Piggee serviced.  *Id.* at 18:16–24.  As previously noted, New Age attempted to obtain these records, but the stores no longer have them.  *See supra* note 35. Therefore, they are not in the summary judgment record.

[104] Piggee Dep. (Doc. 36) at 23:25–24:7.

[105] *Id.* at 29:1–10.

home with [his] family . . . ."[106]  Mr. Piggee's estimates do, however, in some sense account for

vacations and lunch breaks.  He says he took a week-long vacation each year.[107]  And each day,

Mr. Piggee took a fifteen- to twenty-minute lunch break.[108]

Overall, Mr. Piggee estimates that he worked between fifty and fifty-five hours per

week.[109]  Mr. Piggee says he complained "all the time" about the hours he worked and his pay.[110]

He complained to three New Age employees about his hours—specifically, his salesman, Rick

Davis (New Age's General Manager), and Dawn Robbins.[111]  Mr. Piggee told them that his route

"was too big for one person" and that he needed help.[112]  Mr. Piggee bolstered his complaint by

stating that Leo Ornelas, who had serviced the route before Mr. Piggee, "quit because . . . he

couldn't handle the route."[113]  Mr. Davis told Mr. Piggee that "the route could be done" and to

"just get it done [as] quick as possible."[114]  Ms. Robbins responded that New Age didn't "have the

money to add more manpower to help out."[115]  And the record does not indicate what Mr. Piggee's

salesman told him (if anything) in response.

Despite being unhappy about his hours, Mr. Piggee worked for New Age for nearly four

---

[106] *Id.* at 24:16–22.  Mr. Piggee admits that he had been written up for going home before finishing his route.  *Id.* at 24:8–15, 25:6–7.

[107] *Id.* at 16:2–10.  Mr. Piggee could not "remember the specific date[s] when [he] took [his]" vacations.  *Id.* at 16:3–8.

[108] *Id.* at 15:13–17, 15:22–24.  Mr. Piggee says he did not take any other personal breaks, including restroom breaks. *See id.* at 15:25–16:1.

[109] *Id.* at 19:7–10.  Mr. Piggee formed this estimate "[a]t the time that [he] worked the hours."  *Id.* at 19:11–22.

[110] *Id.* at 19:23–20:3.

[111] *Id.* at 20:4–7; Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2) ¶ 3.  The record does not state who Mr. Piggee's salesman was or what role Ms. Robbins played at New Age.

[112] Piggee Dep. (Doc. 36) at 20:4–10.

[113] *Id.* at 20:16–24.

[114] *Id.* at 20:11–17.

[115] *Id.* at 21:3–8.

years.  His tenure ended when he was terminated on February 13, 2021.[116]  According to Mr. Piggee, he was terminated because he "couldn't get out to perform [his] duties" on a day when "the weather was bad . . . ."[117]

## IV.   Mr. Williams

Mr. Williams started working at New Age around February of 2008 or 2009.[118]  For his first six or seven years at New Age, Mr. Williams worked solely as a Merchandiser.[119]  He then "moved up" to a Merchandiser Salesman position.[120]  Mr. Williams held the Merchandiser Salesman position for three or four years.[121]  As a Merchandiser Salesman, Mr. Williams performed the same duties as a Merchandiser but also took stores' orders for future deliveries.[122] The record evidence only reflects Mr. Williams's time at New Age as a Merchandiser Salesman.[123] There is no evidence in the record regarding Mr. Williams's first six or seven years as a Merchandiser.

Mr. Williams recounted his last three or four years at New Age in his deposition testimony—this included some details about his routes and hours worked.[124]  That testimony is as

---

[116] *Id.* at 6:22–7:1.

[117] *Id.* at 7:2–7.

[118] The record does not state the exact date Mr. Williams started at New Age.  The Court reaches this date range by starting at Mr. Williams's last day at New Age and subtracting the number of years he worked there.  His last day was on February 21, 2018.  Williams Dep. (Doc. 37) at 23:21–24:1; Pls.' Resp. to Def.'s Statement of Material Facts (Doc. 23) ¶ 15.  And although Mr. Williams was unsure about how long he had worked at New Age, he ultimately stated: "I guess I worked for them about a little over ten years, a little over nine or ten years, I'm thinking now."  Williams Dep. (Doc. 37) at 7:19–23.  Ten (or nine) years before February 21, 2018, is sometime in February of 2008 (or 2009).

[119] *See* Williams Dep. (Doc. 37) at 9:5–8, 9:12–16.

[120] *Id.* at 9:5–11.

[121] *Id.* at 9:12–16.

[122] *See supra* note 7; Williams Dep. (Doc. 37) at 9:17–10:3, 10:12–16.

[123] *See* Williams Dep. (Doc. 37) at 10:20–23 ("[Mr. Vandiver:] I want to focus on those last few years of your employment that you can remember.").

[124] Although Mr. Williams detailed his route, he also admitted that his day-to-day workload varied.  *Id.* at 10:20–11:2, 16:16–17:7, 18:7–9.

follows.  On Mondays, he started around 6:15 a.m. at the Walmart in Pine Bluff.[125]  Mr. Williams

completed his Merchandiser duties at his last Monday store between 3:00 p.m. and 4:00 p.m., and

then spent between thirty-five and forty minutes calling orders in.[126]  He does not recall what stores

he visited in what order.[127]  On either Tuesdays or Wednesdays, Mr. Williams serviced what he

called the Stuttgart Route—he does not remember which day for sure.[128]  When he did work the

Stuttgart Route, Mr. Williams started at 6:30 a.m. in Altheimer.[129]  He ended the Stuttgart Route

around 3:30 p.m. at the Kroger in DeWitt.[130]  The record includes no information about Mr.

Williams's route on Thursdays.  On Fridays, Mr. Williams started his route at 7:00 a.m. in

Monticello.[131]  He then serviced stores in McGehee, Dumas, and Gould.[132]  Mr. Williams finished

work on Fridays at 4:00 p.m.[133]  He did not work on Saturdays or Sundays.[134]

Mr. Williams's testimony is based purely on his memory.[135]  Mr. Williams did not keep

any notes, records, journals, or logs that could corroborate or contradict his testimony.[136]  And

---

[125] *Id.* at 15:23–16:5, 17:22–25.

[126] *Id.* at 16:6–15, 17:22–25.

[127] When asked what stores he went to on Mondays, Mr. Williams said, "It's been a while, man.  I don't – it's kind of hard to pick out what stores I went [to] on Mondays.  I don't want to say I went to this store and didn't go, I just don't – I forget my – I forgot my route, man.  Been a while."  *Id.* at 11:9–15.

[128] *Id.* at 11:23–12:7, 14:8–10.  The Stuttgart Route included Stuttgart, DeWitt, and Gillett.  *Id.* at 12:1–7.  To be sure, Mr. Williams worked both Tuesdays and Wednesdays; he simply has not identified with certainty which day he worked the Stuttgart Route.  *See generally id.* at 15:12–14 ("I had weekends off when I was a sales merchandiser.").

[129] *Id.* at 14:11–25.  Mr. Williams did not identify what store he started at in Altheimer.

[130] *Id.* at 15:1–11.

[131] *Id.* at 12:15–13:5.  The only specific store Mr. Williams says he serviced in Monticello is Walmart.  *Id.* at 13:10–11.  He does not state how long he would spend at Walmart.

[132] *Id.* at 12:8–22.  His final stop on Fridays was Dollar General in Gould.  *Id.* at 13:15–16.  Mr. Williams did not identify any other stores he serviced on Fridays.

[133] *Id.* at 13:17–24.

[134] *Id.* at 15:12–17.

[135] *Id.* at 17:8–12, 19:7–9.

[136] *Id.* at 17:13–17.

New Age has not presented any such records.  Additionally, Mr. Williams's testimony about his routes and hours does not specifically account for sick days.  It does, however, in some sense account for vacation days, lunch breaks, and personal breaks (or the lack thereof).  Mr. Williams "worked through [his] vacation [time] and sold" it back each year.[137]  As for lunch, he would spend between ten and fifteen minutes eating each day.[138]  Otherwise, Mr. Williams says he took no other breaks while working, including restroom breaks.[139]

Overall, Mr. Williams believes he worked an average of eight hours per day.[140]  He also estimates that he worked about fifty hours per week.[141]  Despite his estimate that he worked fifty hours per week, Mr. Williams never complained to anyone at New Age about his pay.[142]  That makes sense because Mr. Williams apparently didn't realize he should have been getting overtime pay until after he stopped working at New Age.[143]  Mr. Williams's last day at New Age was February 21, 2018.[144]  The record does not indicate why or how Mr. Williams's employment ended.

## V.    New Age Evidence

To counter Plaintiffs' allegations, New Age provided declarations from some of its other

---

[137] *Id.* at 22:1–7.

[138] *Id.* at 13:25–14:3, 22:8–12.

[139] *Id.* at 14:4–6.

[140] *Id.* at 21:17–23.

[141] *See id.* at 18:23–19:2 ("[Mr. Vandiver:] And what is your estimate for the total hours that you would work any given week?  [Mr. Williams:] I would say like 10 hours over a week, my estimate.  [Mr. Vandiver:] Ten hours of overtime a week?  [Mr. Williams:] Yes, sir.").  Mr. Williams cannot point to a specific week that he worked ten hours of overtime without proper overtime compensation.  *Id.* at 18:10–22.

[142] *Id.* at 21:8–12, 22:13–19.

[143] *Id.* at 22:20–23:2.  In fact, Mr. Williams suggests he didn't reach the conclusion until around the time he filed the instant lawsuit.  *See id.* at 22:20–23:8.

[144] *Id.* at 23:21–24:2; Pls.' Resp. to Def.'s Statement of Material Facts (Doc. 23) ¶ 15.

employees.[145]   The first two declarations belong to New Age's Chief Financial Officer, Dawn Frantz, and Mr. Davis.[146]   Both Ms. Frantz and Mr. Davis claim that they "have supervised Merchandisers that have worked every route, and none have ever worked more than forty (40) hours per week."[147]   They further state that "[t]he most load days in a week is two," a load day never requires more than ten hours of work, and that Merchandisers do "not work more than five (5) hours on non-load days."[148]

The other declarations belong to Varick Lott and Marlos Finley.[149] Mr. Lott and Mr. Finley have both worked for New Age as Merchandisers for at least five years.[150]   They claim to have "worked every route and been to every store as" Merchandisers—essentially, they claim that they have worked every route in existence.[151]   According to Mr. Lott and Mr. Finley, no route has ever required them to work more than forty hours a week.[152]   Like Ms. Frantz and Mr. Davis, Mr. Lott and Mr. Finley also state that "[t]he most load days in a week is two," a load day never requires more than ten hours of work, and that Merchandisers do "not work more than five (5) hours on

---

[145] Ex. A (Frantz Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-1); Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2); Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3); Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4).

[146] Ex. A (Frantz Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-1) ¶¶ 1–3; Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2) ¶¶ 1–3.  Recall that Mr. Davis is New Age's General Manager.  *See supra* note 111 and accompanying text.

[147] Ex. A (Frantz Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-1) ¶ 14; Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2) ¶ 15.

[148] Ex. A (Frantz Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-1) ¶¶ 9–10; Ex. B (Davis Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-2) ¶¶ 10–11.

[149] Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3); Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4).

[150] Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3) ¶ 3; Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4) ¶ 3.

[151] Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3) ¶ 13; Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4) ¶ 14.

[152] Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3) ¶ 13; Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4) ¶ 14.

non-load days."[153]

New Age also relies on the deposition testimony of Emanuel Savage and Aaron Christman, two former New Age Merchandisers who were plaintiffs in a different, albeit similar, lawsuit.[154] New Age points out that Mr. Savage and Mr. Christman "testified that they were always paid fairly by New Age."[155]

## VI.    The Dispositive Questions On Summary Judgment

On August 10, 2020, Plaintiffs filed this overtime suit.[156]  After discovery, New Age moved for summary judgment, primarily arguing that Plaintiffs have not produced sufficient evidence of any alleged overtime work.[157]  The questions presented at this stage of the litigation are well-trod, if not entirely straightforward.  First, based on the record evidence, could a rational juror conclude that New Age suffered or permitted any overtime work by any Plaintiff without paying overtime compensation to that Plaintiff? Second, if so, has that Plaintiff produced evidence from which a rational juror could determine the amount and extent of the unpaid overtime work as a matter of just and reasonable inference?

## DISCUSSION

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[158]  The movant bears the initial burden of showing (1) the absence of a genuine dispute as to any material fact and (2) that a rational juror

---

[153] Ex. C (Lott Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-3) ¶¶ 8–9; Ex. D (Finley Decl.) to Def.'s Mot. for Summ. J. (Doc. 17-4) ¶¶ 9–10.

[154] *See Christman v. New Age Distrib., Inc.*, No. 4:19-CV-488-LPR, 2021 WL 1035666 (E.D. Ark. Mar. 17, 2021).

[155] Pls.' Resp. to Def.'s Statement of Material Facts (Doc. 23) ¶ 39; Ex. F (Savage Dep.) to Def.'s Mot. for Summ. J. (Doc. 17-6) at 14:18–20; Ex. E (Christman Dep.) to Def.'s Mot. for Summ. J. (Doc. 17-5) at 15:9–11.

[156] Compl. (Doc. 1).

[157] Def.'s Mot. for Summ. J. (Doc. 17); Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 19).

[158] Fed. R. Civ. P. 56(a).

could not possibly find for the nonmoving party based on the undisputed facts.[159]  If the movant successfully makes this showing, the burden then shifts to the nonmoving party to establish that there is some genuine and material issue to be determined at trial.[160]  The nonmoving party may not rest solely upon the allegations in its pleadings.[161]  To survive summary judgment, the nonmoving party "must demonstrate the existence of specific facts supported by sufficient probative evidence that would permit a" favorable finding "on more than mere speculation, conjecture, or fantasy."[162]

If the nonmoving party can present specific facts "by affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[163]  Of course, the mere existence of a disputed fact will not bar summary judgment.[164]  The dispute must be genuine, which means the evidence could cause a rational juror to decide the particular question of fact for either party.[165]  And the disputed fact must be material, meaning the resolution of the dispute will be outcome determinative under the controlling law.[166]

## I.      FLSA Unpaid-Overtime-Compensation Claim Standard

For work in excess of forty hours per week, the FLSA requires employers to pay employees overtime wages no less than one and one-half (1.5) times their regular rate of pay.[167]  The AMWA

---

[159] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[160] *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997).

[161] *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).

[162] *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 739 (8th Cir. 2017) (cleaned up) (quoting *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[163] *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[164] *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

[165] *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008); *Liberty Lobby, Inc.*, 477 U.S. at 248.

[166] *Holloway*, 884 F.2d at 366.

[167] 29 U.S.C. § 207(a)(1).

requires the same under state law.[168]  "An employee who sues for unpaid overtime 'has the burden of proving that he performed work for which he was not properly compensated.'"[169]

There is a potential quirk to this seemingly simple standard.  The FLSA tasks employers with tracking and recording their employees' work time.[170]  In light of this statutory requirement, both the Supreme Court and the Eighth Circuit have concluded that, when an employer fails to keep wage and hour records, employees cannot be denied recovery because the precise extent of their work cannot be proven.[171]  In such circumstances, an employee can recover for unpaid overtime if that employee "produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."[172]

Importantly, however, this "relaxed standard" is used for proving "the amount of damages," not for proving liability.[173]  Put another way, the "relaxed standard" only applies once the plaintiff has already proven that "he has performed work and has not been paid in accordance with the statute."[174]  To determine liability, the standard of proof is always the same: The plaintiff must prove by a preponderance of the evidence that he performed uncompensated work.[175]  To be clear, before the "relaxed standard" comes into play, a plaintiff must show by a preponderance of

---

[168] Ark. Code Ann. § 11-4-211(a).  Courts routinely analyze AMWA and FLSA claims under the same rubric.  *See Helmert v. Butterball, LLC*, 805 F. Supp. 2d 655, 663 n.8 (E.D. Ark. 2011); *Cummings v. Bost, Inc.*, 218 F. Supp. 3d 978, 985–86 (W.D. Ark. 2016).

[169] *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946)).

[170] 29 U.S.C. § 211(c).

[171] *Anderson*, 328 U.S. at 687; *Dole v. Tony & Susan Alamo Found.*, 915 F.2d 349, 351 (8th Cir. 1990); *see also Zornes v. Thompson Transp. Inc.*, No. 4:19-CV-00474-LPR, 2020 WL 6438252, at *7 (E.D. Ark. Nov. 2, 2020).

[172] *Anderson*, 328 U.S. at 687.

[173] *Christman*, No. 4:19-CV-00488-LPR, 2021 WL 1035666, at *8–9, *8 n.120 (E.D. Ark. Mar. 17, 2021) (collecting authorities).

[174] *Anderson*, 328 U.S. at 688.

[175] *Thompson v. DiMichele Enters., Inc.*, No. 4:18-CV-00903-LPR, 2020 WL 1285040, at *6 (E.D. Ark. Jan. 3, 2020).

the evidence that he worked over forty hours in at least one week, that the employer suffered or permitted the overtime, and that he was not compensated properly for the overtime. This evidentiary burden can be satisfied in different ways, such as time records or testimony.  But— even if one was to apply the relaxed standard throughout the entire case—relying "mainly just [on] recollections of [the employee's] daily activities" does not suffice, at least where those recollections are general and vague.[176]

A plaintiff must provide a meaningful, consistent explanation of the hours the plaintiff claims to have worked.[177]  This explanation must include "details which would allow a jury to determine" that the plaintiff worked the claimed overtime.[178]  Vague and unspecific testimony will not do.[179]  A plaintiff should point to "specific dates worked, specific hours worked, or money owed."[180]  "[U]nsupported estimations of the unpaid hours due are not enough."[181]  Moreover, to succeed on an overtime claim, the employee must also show that his employer knew, or should have known, that the employee was working the claimed overtime.[182]  This is because "the employee must show that the employer had actual or constructive knowledge" that the employee worked overtime hours.[183]  An employer had constructive knowledge if, "through reasonable diligence," the employer "should have acquired knowledge that" the employee was "working in

---

[176] *See Holaway*, 771 F.3d at 1058–60 (citation omitted).

[177] *Id.* at 1060.

[178] *Id.*

[179] *Id.*

[180] *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 407 (8th Cir. 2013).

[181] *Id.*

[182] *Rapp v. Network of Cmty. Options, Inc.*, 3 F.4th 1084, 1087 (8th Cir. 2021).  Subject to exceptions not at issue here, the FLSA makes it illegal to "employ" someone for more than forty hours per week without paying them overtime.  29 U.S.C. § 207(a)(1).  As relevant here, the FLSA defines the word "employ" as "to suffer or permit to work."  *Id.* § 203(g).  The interplay between these two provisions is the origin point for the knowledge requirement.

[183] *Rapp*, 3 F.4th at 1087.

excess of [his] scheduled hours . . . ."[184]  It is not enough that the employer "could have known."[185]

## II.    Plaintiffs' Individual Claims

The Court has, in *Christman v. New Age Distributing, Inc.*, conducted analyses very similar to the analyses called for here.[186]  In *Christman*, the Court applied the facts of that case to the standards set out by the Eighth Circuit in *Holaway v. Stratasys, Inc.* and *Carmody v. Kansas City Board of Police Commissioners*.[187]  The Court will use the same approach here, but will endeavor not to repeat what it has already said plainly in *Christman* about the *Holaway* and *Carmody* standards.  For the reasons set out below, under the applicable standards, New Age is entitled to summary judgment on the claims brought by Mr. Williams and Mr. Jamerson, but not on the claims brought by Mr. Heard and Mr. Piggee.

### A.    Mr. Williams and Mr. Jamerson

Mr. Williams presents the easiest call.  Mr. Williams's principal evidence is his own estimate—solely based on his memory—that he generally worked fifty hours per week.[188]  But this general estimate is at odds with other, more specific, testimony that Mr. Williams gave.  For example, Mr. Williams (1) estimated that, on average, he worked eight hours per day and (2) testified that he did not work Saturdays or Sundays.[189]  Eight hours per day multiplied by five days per week is forty hours per week.

Even putting aside that inconsistency (or concession), Mr. Williams does not support his weekly-hours-worked estimates with anything approaching sufficient detail.  At most, we know

---

[184] *Hertz v. Woodbury Cnty.*, 566 F.3d 775, 781 (8th Cir. 2009).

[185] *Rapp*, 3 F.4th at 1087 (quoting *Hertz*, 566 F.3d at 782).

[186] No. 4:19-CV-00488-LPR, 2021 WL 1035666 (E.D. Ark. Mar. 17, 2021).

[187] *Id.* at *9–11; *see also Holaway*, 771 F.3d 1057; *Carmody*, 713 F.3d 401.

[188] *See supra* pp. 16–18.

[189] *Id.*

Mr. Williams believes he spent about eleven hours working on Mondays, nine hours working on Tuesdays, some unspecified number of hours working on Wednesdays,[190] some unspecified number of hours working on Thursdays, nine hours working on Fridays, and no hours working on weekends.[191]  To state the obvious, that doesn't get a rational juror to forty-plus hours without resort to speculation.  Moreover, Mr. Williams could not recall most of the stores he visited or how long he generally spent at each store.[192]  Indeed, Mr. Williams testified that "it's been a while," so it was "kind of hard to pick out which stores" he went to on which days of the week.[193]  He admits that he "forgot [his] route . . . ."[194]  In short, Mr. Williams's memory-based evidence is nowhere near consistent enough or specific enough to satisfy the standards set out in cases like *Holaway*, *Carmody*, and *Christman*.  No rational juror could conclude on this record that Mr. Williams worked any overtime, let alone determine how much overtime he worked.  And that is true regardless of whether the normal or relaxed standard is used.  New Age is clearly entitled to summary judgment on his claims.

The next easiest decision is Mr. Jamerson.  Recall that Mr. Jamerson worked for New Age from June 9, 2017, to August 15, 2017.[195]  Only the last five days of his tenure come within the

---

[190] Mr. Williams testified that he worked the Stuttgart Route on either Tuesdays or Wednesdays.  *See supra* p. 17.  And he said that the Stuttgart Route would take him nine hours to complete.  *Id.*  Mr. Williams did not otherwise testify to his hours worked on Tuesdays and Wednesdays.  To analyze Mr. Williams's daily-hours-worked estimates, the Court assumes that Mr. Williams worked the Stuttgart Route on Tuesdays.  The analysis would remain the same if the Court assumed the inverse—that is, that Mr. Williams worked the Stuttgart Route on Wednesdays as opposed to Tuesdays.

[191] *See supra* pp. 17–18.  Although it is a real stretch, a rational juror might conclude that Mr. Williams's testimony concerning Mondays, Tuesdays, and Fridays accidentally omitted thirty to forty minutes of work each day.  *See* Williams Dep. (Doc. 37) at 16:13–15 ("And then we had to call our orders in every day.  That takes 35, 40 minutes."); *id.* at 18:4–6 ("I want to state this too:  Like I just told you, sometimes we have to wait, we have to call our orders in, it take[s] 30, 40 minutes doing that.").  It may be that Mr. Williams was excluding time spent placing orders for client stores when he gave his daily estimates.  That doesn't change the analysis.

[192] *See supra* pp. 17–18.

[193] *See supra* note 127.

[194] *Id.*

[195] *See supra* notes 66, 89 and accompanying text.

three-year statute-of-limitations period for FLSA and AMWA claims.[196]  Mr. Jamerson's counsel conceded this point at the summary judgment hearing.[197]  Giving Mr. Jamerson the benefit of the doubt, let us assume that a payday fell within this five-day period—for example, on Friday, August 11, 2017.  Let us further assume that the occurrence of this payday allows us to reach back to overtime work allegedly performed in the two weeks covered by this single payday.  Under this highly generous set of assumptions, the only potential overtime claims on which Mr. Jamerson can potentially proceed relate to the final two-and-a-half weeks of his nine-and-a-half-week employment with New Age.

That Mr. Jamerson can only proceed on claims concerning a small fraction of his tenure at New Age highlights the serious problems with the generalized nature of all of Mr. Jamerson's evidence.  Mr. Jamerson cannot provide any specific evidence of how many hours he worked in the two-and-a-half weeks at issue.  All of Mr. Jamerson's testimony concerning hours worked is general in nature, at most suggesting what he might have worked in a normal week.[198]  Putting aside the problem with testimony that is solely based on memory, there is nothing from which a rational juror could conclude that the specific weeks inside the limitations period followed the

---

[196] 29 U.S.C. § 255(a); *Douglas v. First Student, Inc.*, 2011 Ark. 463, 6, 385 S.W.3d 225, 228 (2011) ("[W]e hold that a three-year statute of limitations would apply to private causes of action brought pursuant to the AMWA.").  There are two statute of limitations periods that govern FLSA actions.  Usually, FLSA actions must be brought "within two years after the cause of action accrue[s] . . . ."  29 U.S.C. § 255(a).  If, however, the FLSA action arises "out of a willful violation" of the FLSA, the limitations period is three years.  *Id.*  The Court need not resolve whether the two-year or three-year limitations period applies.  Even if the three-year period applies, New Age gets summary judgment with respect to Mr. Jamerson's claims for the reasons explained in this section.

[197] The exchange went as follows:

> The Court: . . . I think that Mr. Jamerson's last day with [New Age] was August 15, 2017.  And if I'm correct about that, I think that means in theory maybe there was one payday within the statute of limitations period.  Am I right about that, Mr. Short?

> Mr. Short: That is correct.  The amount of time was very limited, a week or so.

July 11, 2022 Hr'g Tr. (Rough) at 3.

[198] *See supra* pp. 11–12.

generalized pattern to which Mr. Jamerson testified.  Mr. Jamerson doesn't remember specific weeks and he doesn't testify about specific weeks.[199]  He does not and cannot point to a specific day or week on the calendar and say how long he worked that specific day or week.[200]  And Mr. Jamerson's generalized estimate of time worked per week does not include vacation days or sick days, which of course might have been taken in the last two-and-a-half weeks of his tenure.[201]

There is simply no way for a rational juror to conclude (under either the normal or relaxed standard) that Mr. Jamerson worked any overtime in the limitations period, let alone determine how much overtime he worked.  This is especially true given the other problems with Mr. Jamerson's evidence.  First, Mr. Jamerson has given inconsistent estimates of his hours worked per week: at one time suggesting a forty-eight-to-fifty-hour range, and at another time suggesting a forty-five-to-fifty-six-hour range.[202]  Second, while Mr. Jamerson testified to numerous debates he had concerning overtime with New Age personnel, he could not identify any such persons.[203]  Third, Mr. Jamerson could not detail which stores he visited on which days, the order in which he visited the stores, or the time he usually spent at each store.[204]  Fourth, when asked at his deposition, Mr. Jamerson did not even remember when his last day (or month) of work was.[205]  In short, just like Mr. McGee in the *Christman* case, Mr. Jamerson's evidence suffers from all the major shortcomings that doomed the plaintiff's claims in *Holaway*.[206]  And these shortcomings are

---

[199] *Id.*

[200] *See supra* notes 79, 88.

[201] *See supra* p. 12.

[202] *See supra* notes 86–87 and accompanying text.

[203] *See supra* pp. 10–11.

[204] *See supra* notes 78–79 and accompanying text.

[205] *See supra* note 89.

[206] In *Christman*, the Court found that Mr. McGee's "[u]nsupported estimates of unpaid hours due" were not enough to survive summary judgment.  2021 WL 1035666, at *11.  Specifically, Mr. McGee could not identify a specific week that he worked overtime, failed to account for holidays, vacations, sick days, or personal breaks, and presented

amplified here because the statute of limitations narrows the window of focus to a fraction of Mr. Jamerson's time at New Age and thus makes specificity even more important than usual.  New Age is thus entitled to summary judgment on Mr. Jamerson's claims.

B.     **Mr. Heard and Mr. Piggee**

The claims presented by Mr. Heard and Mr. Piggee give the Court more pause.  The testimonies of those two Plaintiffs are pretty detailed—they include the routes they drove, what stores they visited on what days, and how long they worked in each store.  Additionally, as explained below, the similarities between their respective weekly estimates of hours worked provides (in some sense) important corroboration for each estimate—especially given New Age's professed desire to keep route lengths consistent.  Because of the greater detail supporting their estimates and the presence of at least some corroboration, the evidence provided by Mr. Heard and Mr. Piggee does not suffer from the shortcomings that were fatal to Mr. McGee's claims in *Christman*.[207]  Ultimately, the testimonies of Mr. Heard and Mr. Piggee—taken together—are enough to allow a rational juror to (1) conclude that those Plaintiffs each worked at least one hour of unpaid overtime during their tenures at New Age and (2) determine the extent of their unpaid overtime worked "as a matter of just and reasonable inference . . . ."[208]

Mr. Heard and Mr. Piggee have provided detailed testimony identifying their start and end times each day, the specific stores they would visit on each day, and the amount of time they would

---

contradictory estimates.  *Id.*  Essentially, Mr. McGee's testimony failed to sufficiently "identify details which would allow a rational jury to determine that Mr. McGee worked (without appropriate pay) beyond 40 hours in any specific week of his employment . . . ."  *Id.* at *10–11.

[207] Nor are Mr. Heard's and Mr. Piggee's estimates doomed by the lack-of-specificity problem identified with regard to Mr. Jamerson's estimates.  *See supra* pp. 26–28.  Unlike Mr. Jamerson's claims, Mr. Heard's and Mr. Piggee's claims are not narrowed to a few specific weeks by the statute of limitations.  Thus, Mr. Heard and Mr. Piggee do not necessarily need to provide evidence of overtime worked in any particular week on the calendar.  Instead, their detailed and partially corroborated testimonies of their usual hours during their tenures at New Age can be enough because the large bulk of their tenures were within the statute of limitations.

[208] *Carmody*, 713 F.3d at 406 (citation omitted).

spend at each store.  This is in stark contrast to Mr. McGee in the *Christman* case, who "rarely identif[ied] any of the specific stores that he visited" and "struggled to even recount all of the towns that he visited" each day.[209]  For example, Mr. Heard identified the seven stores he visited (and time he spent at each store) on Mondays on his Searcy Route and the eight stores he visited (and time he spent at each store) on Tuesdays on his Searcy Route.[210]  He then recalled that his Thursdays and Fridays on the Searcy Route included the same stores as Mondays and Tuesdays, respectively.[211]  And when asked about Mondays on his West Little Rock Route, Mr. Heard was able to name all six stores he serviced and the time he spent at each store.[212]  Another example is Mr. Piggee's testimony about his Mondays—he named all six stores he serviced on Mondays and the time he spent at each store.[213]  And when asked about Tuesdays, Mr. Piggee recalled the six stores he serviced on Tuesdays and the time he spent at each store.[214]  These kinds of details provide meaningful explanations for how Mr. Heard and Mr. Piggee reached their overall estimates of overtime hours worked.

Additionally, Mr. Heard's and Mr. Piggee's estimates are not as overinclusive as Mr. McGee's estimates were in *Christman* or Mr. Holaway's estimates were in *Holaway*.  In *Christman*, Mr. McGee admitted to taking personal breaks, but failed to account for them in his estimated daily hours worked.[215]  And in *Holaway*, Mr. Holaway failed to account for paid holidays

---

[209] 2021 WL 1035666, at *10; *see Holaway*, 771 F.3d at 1060 (holding that plaintiff's FLSA claim could not survive summary judgment where plaintiff "failed to provide a meaningful explanation of how he arrived at his final estimate of sixty hours a week, every week, of his employment").

[210] *See supra* notes 39–40.

[211] *See supra* notes 42–43.

[212] *See supra* note 51.

[213] *See supra* note 94.

[214] *See supra* note 96.

[215] 2021 WL 1035666, at *11.

or vacations in his estimated hours worked.[216]  In the instant case, Mr. Heard and Mr. Piggee did account for some of the breaks or vacations they took.  Mr. Heard accounted for lunch breaks, stating that he would eat while driving from one store to the next.[217]  And Mr. Piggee says he took one week-long vacation per year, stopped for fifteen-to-twenty minutes each day for lunch, and took no other breaks.[218]  It is true that there are other breaks and potential days off that Mr. Heard and Mr. Piggee did not account for—for example, paid holidays or days when Mr. Piggee left work for personal reasons.[219]  But those unaccounted-for breaks or days off are not enough to completely obliterate Mr. Heard's and Mr. Piggee's overtime claims.[220]  Put another way, even if Mr. Heard and Mr. Piggee had other breaks or days off, a rational juror could still find that they each worked at least one hour of overtime at some point during their tenures at New Age.

Further, Mr. Heard's and Mr. Piggee's testimonies do not contain the same inconsistencies that Mr. McGee's testimony contained in the *Christman* case.  Mr. McGee estimated that he "'routinely' worked 55 to 60 hours a week[,]" but then gave daily estimates that added up to between forty and forty-five-and-a-half hours per week.[221]  That is a gap of between nine-and-a-half and twenty hours.  Mr. Heard's and Mr. Piggee's estimates don't include such wide gaps— their weekly and daily estimates are far more consistent.

---

[216] *Holaway*, 771 F.3d at 1060.

[217] *See supra* note 36.

[218] *See supra* p. 15.

[219] *See supra* pp. 6, 14–15.

[220] For example, Mr. Piggee testified that he would break once or twice a month for "no longer than an hour" to care for his daughter.  *See supra* p. 14.  Assuming he did spend two full hours each month caring for his daughter, that would not be enough to bring Mr. Piggee's estimated weekly hours worked down to forty hours.  He estimates he worked between fifty and fifty-five hours per week.  *See supra* note 109 and accompanying text.  Even if one discounts that estimate by two hours per month, Mr. Piggee has still alleged that he worked a significant number of hours of unpaid overtime.

[221] *Christman*, 2021 WL 1035666, at *9, *11 (citation omitted); *see also Holaway*, 771 F.3d at 1059 (Plaintiff "failed to meet even the relaxed evidentiary standard" where he "put forth contradictory and bare assertions of his overtime hours worked").

Consider Mr. Heard's estimates first.  Mr. Heard estimated that he spent between fifty and fifty-two hours per week on the Searcy Route.[222]  And Mr. Heard's Searcy Route daily estimates add up to between forty-eight-and-a-half and fifty-one hours per week.[223]  The small gap between these estimates is not a red flag in the way the much larger gap in *Christman* was.  Mr. Heard's West Little Rock Route estimates are fairly close too.  Mr. Heard estimated that he worked about fifty-five hours per week on the West Little Rock Route.[224]  And his West Little Rock Route daily estimates add up to between fifty-one and fifty-three hours per week.[225]  That is only between two and four hours off from his weekly estimate.

Consider next Mr. Piggee's estimates.  Mr. Piggee estimated that he worked between fifty and fifty-five hours per week.[226]  And his daily estimates add up to between fifty-three-and-a-half and fifty-five hours per week.[227]  Mr. Piggee's weekly estimates thus align almost exactly with his daily estimates.  It is true that Mr. Heard's and Mr. Piggee's weekly estimates do not match their daily estimates precisely.  But they are significantly closer than Mr. McGee's weekly and daily estimates were in *Christman*.

To be sure, it is not entirely clear that Mr. Heard's and Mr. Piggee's respective testimony, each taken on its own, satisfies the standards set out in cases like *Holaway* and *Carmody*.  Mr. Heard's and Mr. Piggee's estimates are based solely on their memories.[228]  And binding precedent like *Holaway* makes it very difficult for a plaintiff to get past summary judgment on FLSA claims

---

[222] *See supra* note 37 and accompanying text.

[223] *See supra* p. 8.

[224] *See supra* note 50 and accompanying text.

[225] *See supra* p. 9.

[226] *See supra* note 109 and accompanying text.

[227] *See supra* p. 14.

[228] *See supra* notes 32, 102 and accompanying text.

that are "based on mainly just recollections of [the plaintiff's] daily activities . . . ."[229]  But this case is different than many FLSA overtime cases in an important way—Mr. Heard's and Mr. Piggee's estimates of overtime hours worked are essentially the same.  They both estimated that (depending on the route) they worked between fifty and fifty-five hours per week.[230]  And the consistency of their estimates is really important, considering New Age submitted four declarations—one from an executive, one from a Manager, and two from Merchandisers—stating that New Age strives "to keep the length of each route consistent . . . ."[231]  So, not only are Mr. Heard's and Mr. Piggee's estimates more detailed than the usual memory estimates we see in FLSA cases, they are also corroborated (to some extent) by each other.  In short, the record evidence for each Plaintiff is stronger than that Plaintiff's mere recollections standing entirely alone would be.[232]

The bottom line is this: Mr. Heard's and Mr. Piggee's detailed testimonies and consistent hours-worked estimates could lead a rational juror to conclude that they each worked at least one hour of unpaid overtime during their tenures at New Age.  Further, their evidence is enough for a rational juror to determine the extent of their overtime hours worked under the relaxed standard.  Although Mr. Piggee's and Mr. Heard's estimates are ranges, small, consistent ranges are not fatal under the relaxed standard.  "*Anderson* allows uncertainty . . . for the amount of damages."[233]  *Anderson* requires only that a rational juror be able to determine "the amount and extent of [a

---

[229] *Holaway*, 771 F.3d at 1058 (cleaned up); *see also Christman*, 2021 WL 1035666, at *3, *10 (pointing out that Mr. McGee's testimony was "based purely on his memory" and was "completely uncorroborated").

[230] *See supra* notes 37, 47, 50, 109 and accompanying text.

[231] *See supra* note 23 and accompanying text.

[232] *Holaway* involved only one plaintiff and his recollections.  771 F.3d at 1057, 1060.  *Carmody*, while involving multiple plaintiffs, didn't have the corroborative record evidence we do here.  713 F.3d at 403–05 (upholding the district court's decision to strike plaintiffs' affidavits that set out detailed time estimates).

[233] *Carmody*, 713 F.3d at 406.

plaintiff's] work as a matter of just and reasonable inference . . . ."[234]  That standard is met by Mr. Heard and Mr. Piggee.

The fact that New Age has presented evidence that no route takes more than forty hours per week and that other Merchandisers feel like they have been paid fairly does not change these conclusions.[235]  All that New Age's evidence does is create a genuine dispute of material fact that must be resolved by a jury.  New Age primarily argues that Mr. Heard's and Mr. Piggee's evidence is insufficient because they rely solely on their own memories and do not point to "triggering factors that could explain their estimates . . . ."[236]  But, as the Court explained above, Mr. Heard and Mr. Piggee have offered "meaningful explanation[s] of how [they] arrived" at their estimates.[237]  And, in light of the cross-corroboration of their estimates discussed above, that is all they have to do to survive summary judgment under Eighth Circuit precedent.[238]

---

[234] *Id.* (quoting *Anderson*, 328 U.S. at 687–88).

[235] *See supra* pp. 18–20.

[236] Def.'s Br. in Supp. of Summ. J. (Doc. 19) at 2–10.

[237] *Holaway*, 771 F.3d at 1060.

[238] New Age does not appear to argue that Plaintiffs have failed to present sufficient evidence that New Age had actual or constructive knowledge of Plaintiffs' alleged overtime hours worked.  *See* Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 19); Reply in Supp. of Def.'s Mot. for Summ. J. (Doc. 25).  Even if New Age did present such an argument, however, it would not change the outcome.  Mr. Heard and Mr. Piggee both testified that they complained to at least one New Age superior at some point about their hours.  *See supra* pp. 10, 15.  Mr. Heard said he complained to his supervisor, Mr. Gallot.  *See supra* p. 10.  And Mr. Piggee said he complained to his salesman, Mr. Davis, and Ms. Robbins.  *See supra* p. 15.  Their testimonies are enough for a rational juror to conclude that New Age had constructive knowledge (if not actual knowledge) of their overtime hours worked.

On a separate front, New Age briefly argues that, even if Mr. Heard and Mr. Piggee worked unpaid overtime hours, any "such work would have had to be *de minimis*."   Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 19) at 13.  In support of this argument, New Age posits that if Plaintiffs did work the overtime hours that they allege, they "would have been paid for [that] time."  *Id.*  This argument fails for at least two reasons.  First, there is no evidence in the record that New Age tracks Merchandiser hours and pays overtime for weekly hours worked in excess of forty hours.  In fact, New Age states in its Statement of Facts that "Merchandisers are paid their full *salary* even when they work less than eight hours in a single day."  Def.'s Statement of Facts (Doc. 18) ¶ 23 (emphasis added).  This suggests that Merchandisers were paid a set amount (i.e., a "salary") regardless of hours worked.  Second, as New Age points out, *de minimis* overtime worked is "typically only a few minutes in duration."  Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 19) at 13 (citing *Saunders v. John Morrell & Co.*, No. C88-4143, 1992 WL 531674 (N.D. Iowa Oct. 14, 1992)); *see also Lyons v. Conagra Foods Packaged Foods LLC*, 899 F.3d 567, 584 (8th Cir. 2018) ("This legal concept, known as '[t]he *de minimis* doctrine allows employers to disregard otherwise compensable work when only a few seconds or minutes of work beyond the scheduled working hours are in dispute.'" (alteration in original) (citation omitted)).  In this case, far more than a few seconds or minutes of alleged overtime is at issue.  Mr. Heard and Mr.

**CONCLUSION**

Accordingly, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.[239]   New Age is granted summary judgment on the claims brought by Mr. Williams and Mr. Jamerson, but not on the claims brought by Mr. Heard and Mr. Piggee.

IT IS SO ORDERED this 30th day of March 2023.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

Piggee have alleged hours of unpaid overtime.  *See supra* pp. 7–9, 13–15.  And even just one hour is far greater than a couple of minutes.

[239] Doc. 17.